# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN

## WHOLESALE MEAT INDUSTRY

### AND

## UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 342, AFL-CIO, CLC

**May 9, 2003 to May 9, 2007**



ORIGINAL

RECEIVED
NOV 9 2004
By FK

5218

ORIGINAL

# TABLE OF CONTENTS

ARTICLE 1 - UNION RECOGNITION ...................................................4
ARTICLE 2 - UNION SHOP ...........................................................5
ARTICLE 3 - ASSOCIATION MEMBERSHIP ................................................6
ARTICLE 4 - CHECK-OFF OF UNION DUES AND ACTIVE BALLOT CLUB ..........................6
ARTICLE 5 - HOURS ................................................................7
ARTICLE 6 - SHIFTS, PREMIUM PAY AND ADDITIONAL SHIFTS................................9
ARTICLE 7 - GUARANTEED WORK WEEK...................................................10
ARTICLE 8 - WAGES ................................................................11
ARTICLE 9 - HOLIDAYS .............................................................12
ARTICLE 10 - VACATIONS ...........................................................15
ARTICLE 11 - PRIOR BENEFITS ......................................................16
ARTICLE 12 - SICK LEAVE ..........................................................16
ARTICLE 13 - PROMOTIONS...........................................................17
ARTICLE 14 - UNIFORMS AND TOOLS ..................................................17
ARTICLE 15 - SENIORITY ...........................................................18
ARTICLE 16 - LEAVE OF ABSENCE ....................................................19
ARTICLE 17 - LAY-OFF..............................................................20
ARTICLE 18 - DISCHARGE............................................................20
ARTICLE 19 - HEALTH CARE FUND ....................................................20
ARTICLE 20 - PENSION FUND ........................................................23
ARTICLE 21 - SECURITY BENEFIT FUND ...............................................25
ARTICLE 22 - SAFETY-EDUCATION-CULTURAL FUND ......................................26
ARTICLE 23 - LEGAL FUND...........................................................26
ARTICLE 24 - SEVERANCE ...........................................................27
ARTICLE 25 - UNION SIGN ..........................................................27
ARTICLE 26 - TRAILERS ............................................................27
ARTICLE 27 - CHANGE IN DELIVERY OPERATION ........................................27
ARTICLE 28 - SHOP STEWARDS .......................................................27
ARTICLE 29 - BEREAVEMENT LEAVE....................................................28
ARTICLE 30 - JURY DUTY ...........................................................28
ARTICLE 31 - UNION VISITATION ....................................................28
ARTICLE 32 - INDIVIDUAL CONTRACTS ................................................29
ARTICLE 33 - EMPLOYEES RIGHTS.....................................................29
ARTICLE 34 - CORPORATION OR PARTNERSHIP ..........................................29
ARTICLE 35 - STRIKES OR LOCKOUTS..................................................29
ARTICLE 36 - GRIEVANCES AND ARBITRATION...........................................30
ARTICLE 37 - LABOR-MANAGEMENT COMMITTEE ..........................................31
ARTICLE 38 - REAL PARTY IN INTEREST ..............................................31
ARTICLE 39 - SUCCESSORS AND ASSIGNS ..............................................31
ARTICLE 40 - SEPARABILITY ........................................................32
ARTICLE 41 - CONTRIBUTIONS DEFAULT ...............................................32
ARTICLE 42 - CREDIT UNION ........................................................34
ARTICLE 43 - DURATION OF AGREEMENT ...............................................35
WAGE PROGRESSION SCHEDULES FOR BEGINNERS NEW TO THE INDUSTRY ......................36
SCHEDULE "A" .....................................................................37
SCHEDULE "B".....................................................................37
SCHEDULE "C".....................................................................38
SCHEDULE "D" .....................................................................38

SCHEDULE "E"...................................................................................................................39
SCHEDULE "F"...................................................................................................................39
SCHEDULE "G" .................................................................................................................40
SCHEDULE "H" .................................................................................................................40
SCHEDULE "I"...................................................................................................................41
SCHEDULE "J"...................................................................................................................41
SCHEDULE "K" .................................................................................................................41
SCHEDULE "L"...................................................................................................................42

Local 342 has attempted to print in this contract booklet what it believes to be the final terms of the Collective Bargaining Agreement with your Employer. However, at times these booklets may contain typographical errors. In the event of any discrepancies between the herein booklet and the actual contract, the terms of the actual signed contract shall prevail.

**THIS AGREEMENT**, made by and between

H & MS Meat Corp.

(Name of Employer)

Hunts Point Cooperative Market, Bldg B-22, Bronx, NY 10474

(Address)

(Hereinafter referred to as the "Employer") and the **UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 342, AFL-CIO, CLC,** having its principal office located at 166 East Jericho Turnpike, Mineola, New York 11501 (hereinafter referred to as the "Union"), governing the working hours, wages and all working conditions as hereinafter set forth.

**WHEREAS,** the Union is a labor organization composed of employees of the wholesale meat, food and allied products business and/or fat rendering, waste converters and allied products business, and meat processing and poultry, and;

**WHEREAS,** the parties desire to enter into an Agreement, relating to wages, hours and other conditions of employment for the purpose of establishing and maintaining harmonious relations between them, and to that end, provide for a fair and peaceful adjustment of all disputes which may arise between them, and;

**WHEREAS,** this collective bargaining Agreement has been negotiated by and between Representatives of the Union and Representatives of the Meat Trade Institute (Wholesale Meat Industry), hereinafter called "Association."

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, the parties agree as follows:

The Employer may, from time to time continue to make or change such rules and regulations as it may deem necessary or proper to the conduct of its business, provided that the same are not inconsistent with any of the provisions of this Agreement. All such rules and regulations shall be observed by the employees covered by this Agreement.

## ARTICLE 1 - UNION RECOGNITION

The Employer hereby recognizes the Union as the sole collective bargaining agent on behalf of all its production, shipping, receiving, chauffeur, helper, sales, office and maintenance employees and such other employees performing work incidental thereto, employed by the Employer, in its plant or any and all other plants now operated, or hereafter acquired and operated during the term hereof, by the Employer, located in the State of New York and/or State of New Jersey, excluding non-working supervisors and such other categories as are excluded by the Labor Management Relations Act of 1947 and as amended.

4

# ARTICLE 2 - UNION SHOP

(a)    It shall be a condition of employment that all employees of the Employer covered by this Agreement, who are members of the Union in good standing on the date of the signing of this Agreement, shall remain members in good standing, and those who are not members on the date of the signing of this Agreement shall, on or after the thirtieth day following the date of the signing of this Agreement, become and remain members in good standing by the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date of this Agreement shall on or after the thirtieth day following the beginning of such employment become and remain members in good standing in the Union.

(b)    In the event that new help is required, the Employer shall immediately notify the Union, and the Union shall have forty-eight (48) hours (exclusive of intervening Saturdays, Sundays or Holidays) within which to recommend from the open market the help so required.

(c)    If, within a period of forty-eight (48) hours the Union fails to recommend satisfactory employees to the Employer then, at the expiration of such forty-eight (48) hour period, the Employer shall have the option of seeking its help from the open market.

(d)    Selection of applicants for referral jobs by the Union shall be on a non-discriminatory basis and shall not be based on or in any way be affected by Union membership, by-laws, rules, regulations, constitutional provisions or any other aspect of Union membership, policies or requirements. Nothing herein contained shall deny the Union the right to select applicants for referral on the basis of experience in the industry, qualifications and skill, or Employer preference.

(e)    The Employer at all times retains the right to reject any job applicant referred by the Union.

(f)    The parties to this Agreement shall keep posted in places where notices to employees and applicants for employment are customarily posted, copies of the above provisions, pertaining to hiring of new employees.

(g)    All beginning employees new to the industry, if and when hired, shall be deemed temporary and on a trial basis for a period of ninety (90) calendar days; thereafter they shall be considered as regular employees. All such beginning employees new to the industry shall not be required to become Union members as a condition of continuous employment until on or after the thirtieth day subsequent to the beginning of their employment.

(h)    Other new employees shall be deemed regular employees at the time of hire and shall be granted the same terms and working conditions as regular employees; however, they shall not be required to become Union members as a condition of continuous employment until on or after the thirtieth (30th) day subsequent to the beginning of their employment. Contributions to the Pension, Welfare and Supplementary Unemployment Benefit Funds on behalf of such employees shall commence with the first day of the month following the completion of thirty (30) calendar days of employment.

(i)     For the sole purpose of establishing the pay rate for a newly hired regular employee, the Employer will recognize previous verified comparable market experience within the Union's jurisdictional area during the thirty (30) months immediately preceding the newly hired employee's date of hire. If the previous market experience is recognized, the employee will be hired at classification rate/progression scale. If not, the employees will be hired at the "New Hire" rate. The Employer agrees it will recognize the previous verifiable industry experience and apply it to Holiday and Sick Pay.

## ARTICLE 3 - ASSOCIATION MEMBERSHIP

The Union recognizes that certain Employers have designated the Meat Trade Institute as their collective bargaining agent.

Where notice is required to be given to any Employer who is a member of the Association, a copy thereof shall be furnished to the Association. The Association shall, at least annually, provide the Union with a current list of its membership indicating thereon the business names of its members, the address of such members' principal place of business, the names and titles of its officers and their home addresses.

It is agreed that with respect to the members of the aforementioned Association, Article 1 of this Agreement shall be deemed modified in the following respects:

1.      At the time of the execution of this Agreement, the parties will delete those categories of employment in which the Union does not have a majority of employees in such category.

2.      If at the time of the execution of this Agreement, there are employees in any category that has been deleted who are members of the Union, only such employees shall be listed by their names in a separate schedule annexed to this Agreement, and this Agreement shall be applicable to them in all respects.

3.      If new employees are hired in such categories, and they be or become Union members, and if there is still less than a majority in such category of employment, such new employees shall be added to the schedule annexed to this contract.

4.      If during the term of this Agreement, by reason of organization of such employees or by hiring of new employees, there shall be a majority within a category of employment, then the entire category shall be treated as Union members, even if such category had previously been deleted from the Agreement.

## ARTICLE 4 - CHECK-OFF OF UNION DUES AND ACTIVE BALLOT CLUB

(a)     Subject to delivery by the Union to the Employer of written irrevocable Assignments duly signed by each employee as required by law, the Employer will deduct from the wages of each employee weekly and remit to the Union monthly, not later than the 15th day of each calendar month, the dues, initiation fees, and/or assessments payable by such employee to the

Union. Deductions from the wages of each employee shall be made once each week or payday except when such payday falls during the paid vacation of the employee, in which case the deductions shall be made from the employee's advance vacation pay. No deductions shall be made from the wages of a new non-Union employee during the first thirty (30) days of his or her employment.

(b)    The Employer will cause each monthly remittance to be accompanied by a full list of its employees, noting thereon employees added or removed from the list during the preceding month, the respective dates of such additions and removals and the reason therefore, and, in the case of an added non-Union employee, also the word "New".

(c)    It is agreed between the Employer and the Union that should the Employer fail to comply with the terms of this section, the Union shall have the right to order a work stoppage of the employees of the Employer upon one (1) week's written notice to the Employer, and that such work stoppage shall not be a breach of this contract.

(d)    The Employer agrees to deduct an amount from the pay of each employee, not to exceed twenty (20¢) cents per week, who, is a Union member and executes an appropriate voluntary check-off authorization from to the UFCW Active Ballot Club. Deductions shall be in the amount specified in the check-off authorization form signed by the employee and deducted every week. The deduction shall continue for the life of this Agreement for those employees who sign UFCW Active Ballot Club check-off authorization forms unless they are revoked individually and in writing.

(e)    The Employer agrees to transmit UFCW Active Ballot Club deductions to the UFCW Active Ballot Club in care of the Union, within fifteen (15) days after the last day of the last payroll period each month. The Employer further agrees to transmit to the Union at the same time the names of those employees for whom deductions have been made and the amounts deducted for each employee.

## ARTICLE 5 - HOURS

(a)    Forty (40) hours shall constitute a standard work week which shall be divided into eight (8) hours per day (Monday through Friday inclusive) for all employees except office workers, for whom the standard work week shall be thirty-five (35) hours divided into seven (7) hours per day (Monday through Friday inclusive.)

(b)    The standard work day shall be nine (9) consecutive hours, with one (1) hour off for lunch, the lunch hour being not later than four and a half (4½) hours after starting time, except that the standard work day for office workers shall be eight (8) hours with one (1) hour for lunch, the lunch hour being not later than (4) hours after starting time.

(c)    All work performed after eight (8) hours of work shall be considered overtime and shall be paid for at the rate of time and one-half (1-½) the regular rate of pay.

(d)    All work performed by office workers after seven (7) hours of work shall be considered

overtime and shall be paid for at the rate of time and one-half (1½) the regular rate of pay.

(e)    Overtime shall first be offered to the most senior employees. If the Employer is unable to adequately staff a department, employees shall be required to work, and will be called in inverse order of seniority by classification and rotated thereafter.

(f)    The first eight (8) hours (except seven (7) hours for office workers) of work performed on Saturdays shall be paid at the rate of time and a half (1½). All work performed over eight (8) hours (except seven (7) hours for office workers) on Saturdays shall be paid at the rate of double time (2x). Starting time on Saturdays must be the regular weekly starting time unless otherwise consented to by the Union.

(g)    All work performed on Sundays and Holidays shall be paid at double (2x) the regular rate of pay, except that if an employee works on Veteran's Day, he shall be paid at his regular rate of pay for the first seven (7) hours plus seven and one-half (7½) hours pay, at straight time, for the holiday.

(h)    The Employer guarantees four (4) hours work on Saturday, Sunday or Holidays, or four (4) hours pay in lieu thereof, at the rate of pay called for on such days.

(i)    The starting time for all production employees within each classification and/or department shall be either 4:00 A.M. or 5:00 A.M. or as is presently practiced, but no earlier than 4:00 A.M., including Saturdays, Sundays or Holidays. Each production employee shall be notified of his or her starting time no later than the Friday before the beginning of the workweek, which starting time shall not be changed during the workweek. Except as provided in, Article 5 - Hours (m).

(j)    The starting time for all drivers shall be between 4:00 A.M. and 8:00 A.M. All employees shall be notified of their starting time no later than the Friday before the beginning of the workweek which starting time shall not be changed during the workweek. Except as provided in, Article 5 – Hours (m).

(k)    The starting time for office employees shall be as is presently practiced.

(l)    An Employer lawfully engaged in the sale of both "Kosher" and non-Kosher" meats and meat products may not sell, fabricate or deliver any Kosher meats or meat products on any of the thirteen (13) religious holidays.

(m)    Compensation for all hours worked before the agreed starting time shall be at the rate of time and one-half (1½) and shall be known as "under-time". The Employer shall have the right to schedule employees for a 3:00 am start time with the following understanding: Employees who have been starting at 3:00 A.M. and were receiving time and one-half (1½) shall continue to receive time and one-half (1½) for hours currently worked as of May 9, 2003. Otherwise employees who are scheduled to begin work at 3:00 A.M. shall receive a twenty percent (20%) premium.

(n)    Any employee who shall be entitled to pay for thirty-five (35) hours work from his Employer during any week, shall not work for any other Employer in the industry on any week day (Monday through Friday inclusive) nor shall he work for any other Employer in the industry on Saturdays, Sundays or Holidays if his Employer requests the employee to work for the Employer on any such day.

(o)    All employees shall be granted a fifteen (15) minute rest period within the first three (3) hours worked. Office workers shall receive, in addition to the rest period, a coffee break in the afternoon. Employees who are required to work more than nine and one-half (9½) hours in anyone day including under-time and/or overtime, cumulatively, shall be given an additional rest period of fifteen (15) minutes. There shall be no obligation on the part of the Employer for additional rest periods other than as provided herein regardless of past practice.

(p)    Once an employee has completed a day's work or a night's work, said employee shall be relieved from duty for a period of at least ten (10) hours before he may be given a new assignment.

## ARTICLE 6 - SHIFTS, PREMIUM PAY AND ADDITIONAL SHIFTS

(a)    The Employer shall have the right to institute regular additional shifts, whose starting time shall be no earlier than ten (10) hours following the starting time of their regular day shift. However, an additional shift for janitors and porters may be instituted at any time.

(b)    Should the Union oppose the need for an additional shift, a committee shall be convened within forty-eight (48) hours after the Union notifies the Employer of its opposition. Said Committee shall consist of two (2) Representatives of the Union; (2) Employers chosen by the Meat Trade Institute and one (1) Attorney who is counsel to the Association. The decision of a majority of this Committee as to the need for the additional shift shall be final and binding on the parties.

(c)    All employees working on a regular scheduled night shift are to receive an additional ten percent (10%) over the employee's regular rate of pay.

(d)    An employee classified as a general helper and who works on the band saw shall receive a seventy-five cent (75¢) per hour premium for all hours worked on the band saw.

(e)    No employees shall be transferred from a regular day shift to a regular additional shift without his consent. The Employer must present employment on such additional shift to his present employees on a seniority basis before he may hire "new" employees.

(f)    The present starting time for all regularly scheduled night shifts now in effect shall be maintained and no change can be made without the mutual consent of the Employer and the Union.

(g)    When an Employer operates more than one regular shift, and thereafter an opening occurs on the day shift, the Employer must present to all employees working on the additional shift, in

the order of their seniority, an opportunity to accept employment on the day shift, before any new employee may be hired.

## ARTICLE 7 - GUARANTEED WORK WEEK

(a)    All regular employees shall be guaranteed a minimum of thirty-seven and one-half (37½) hours work, per week, apportioned equally at seven and one-half (7½) hours per day, Monday through Friday inclusive, or shall be paid in lieu thereof, provided said employees are available for work. This guarantee shall operate on a weekly basis. In weeks in which a holiday occurs, the guaranteed workweek is reduced to thirty (30) hours. Employees are to receive in those weeks, thirty (30) hours of guaranteed work plus seven and one-half (7½) hours of holiday pay. The foregoing guarantee shall not apply to anyone who is laid off during any workweek who has received the required five (5) working days' notice of layoff as set forth in Article 17.

(b)    All scheduled and personal holidays, sick leave days, and vacation days shall be paid for on the basis of a seven and one-half (7½)-hour day.

(c)    The provisions of this Agreement with respect to a guaranteed workweek or guaranteed workday shall not apply in the event of an emergency. An "emergency" shall be deemed to mean the following:

(1)    An Act of God;

(2)    A closing of the Employer's establishment caused by the failure of the public utility system or systems on a community-wide basis;

(3)    The inability of an employee or employees to report to work as a consequence of a major snow storm in circumstances in which only an inadequate number of employees are able to report to work because of such adverse weather conditions. Employees who report to work despite a major snowstorm shall be paid regardless of whether or not the business of the Employer is able to function on that day;

(4)    The inability of the Employer to operate its establishment on a given day because of a major strike of a supplier of product or transportation system which results in the failure of product to be delivered on substantially an industry-wide basis;

(5)    An act by the municipality, State or Federal Government (including USDA) which causes or results in a shutdown of the plant;

(6)    Industry-wide strike or plant closure that limits the availability of product to a plant.

In addition to the above, not more than two (2) times during any contract year, the guaranteed workweek or guaranteed work day provisions shall not apply in the event of the inability of the Employer to operate its plant as a result of any other emergency not within the Employer's control.

(d)     The parties agree that the Employer may schedule a workweek of four (4) days.

(1)     In the event the Employer schedules such a "short" workweek, the non-working day (or days) may be' any day of the week. If one of the scheduled days off is Friday, no employee in the department affected shall be required to report to work on the following Saturday. In no event shall any employee be required to work more than six (6) short workweeks in any contract year. There shall be no short workweek in a calendar week in which there is a holiday provided for in Article 9 of this Agreement.

(2)     In order to schedule a short workweek, the Employer shall give to its employees and the Union not less than two (2) working days notice of its intention to schedule a short workweek. If a short workweek is scheduled, no employee in the department affected shall be required to work more than ten (10) hours per day including overtime during that week.

(3)     The Employer may "split" a shift or department when scheduling a short workweek provided that at least one-half (½) of the normal complement of workers on that shift or department are scheduled for work.

(4)     Overtime shall continue to be paid to all employees for work performed after eight (8) hours in anyone day (seven (7) hours for office workers).  The Employer agrees to guarantee no less than twenty-eight (28) hours of work or pay in lieu thereof during any such week.

(5)     If, after giving notice of its intention to schedule a short work week, the Employer changes its mind, the employees shall have the option of not working on the days off originally so scheduled by the Employer, and if called in, shall be guaranteed five (5) hours work or pay in lieu thereof.

## ARTICLE 8 - WAGES

All employees covered by this Agreement shall receive the following across the board wage increases as follows:

(a)     Employees not in progression:

| | |
|---|---|
| Effective January 4, 2004 | 50¢ per hour |
| Effective May 2, 2004 | 40¢ per hour |
| Effective January 2, 2005 | 50¢ per hour |
| Effective May 1, 2005 | 40¢ per hour |
| Effective January 1, 2006 | 50¢ per hour |
| Effective April 30, 2006 | 70¢ per hour |

(b)     Employees in progression shall continue in their current progression schedule and in addition, they shall receive the following wage increases:

Effective January 4, 2004 .................. 60¢ per hour
Effective January 1, 2005 .................. 60¢ per hour
Effective January 1, 2006 .................. 60¢ per hour
Effective January 1, 2007 .................. 60¢ per hour

Once an employee reaches the top scale within their progression, they shall then receive the wage increases as stated in (a) above when eligible.

(c)    In addition to the wage increases set forth above employees shall be entitled to payment of bonuses as follows:

All employees on the Employers payroll as of May 9, 2003, shall receive a bonus of One Thousand Five Hundred ($1,500.00) Dollars. The Employer agrees to deduct FICA only from this bonus payment.

All employees on the Employers payroll as of May 9, 2003, shall receive a bonus of Five Hundred ($500.00) Dollars on December 1, 2003. The Employer agrees to deduct FICA only from this bonus payment.

(d)    There shall be no wage reduction in any case where employees receive higher wages than those provided in this Agreement.

(e)    No employee shall suffer a reduction in pay because of a transfer from one job to another.

(f)    An employee who is injured in the course of his regular employment and who as a result of such injury shall be unable to continue work for the remaining part of the day shall receive one (1) regular day's straight time pay for such day, provided that he present to the Employer a certificate of a duly licensed physician who examined the injury, stating that he was unable to continue work on that day because of said injury.

(g)    The Union and the Employer agree that they shall not encourage employees to migrate from one Employer to another within the Wholesale Meat Industry.

(h)    Beginning employees who are not beginners new to the industry, shall be paid minimum wages set forth in Schedules "B" through "K" attached hereto.

(i)    The starting rates and progression scale for all employees hired after May 12, 1995 shall be that as set forth in Schedule "L" of this Agreement.

## ARTICLE 9 - HOLIDAYS

(a)    All employees shall be paid for the following holidays, for which they are not required to perform any work:

New Year's Day                          Labor Day
Martin Luther King Junior's Birthday    Presidential Election Day

| | |
|---|---|
| President's Day (Washington's Birthday) | Veteran's Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Christmas Day |
| Independence Day | |

If any of the foregoing holidays falls on a Sunday, it shall be celebrated on the succeeding Monday.

(b)    Employees on the payroll as of May 9, 2003, with at least two (2) years of service, who have not yet received their full complement of paid holidays, shall immediately receive three (3) personal days in lieu of the Veterans Day, Martin Luther King Junior's Birthday, and Presidents Day holidays.

Double Time Holidays - For work performed on New Year's Day, Memorial Day, Independence Day, Labor Day, Presidential Election Day, Thanksgiving Day or Christmas Day, employees shall be paid double their regular rate of pay plus holiday pay.

Straight Time Holidays - Veteran's Day, Martin Luther King Junior's Birthday, Good Friday and President's Day shall be straight time holidays. Employees shall be given the opportunity to work on these holidays or to take the day off if they are entitled to the holiday. If the Employer has a sufficient complement of personnel and operates on such day, any employee who is entitled to the holiday and who agrees to work shall receive his or her regular rate of pay plus one (1) day holiday pay.

(c)    In order to be eligible to be paid for a holiday, an employee must work the scheduled workday before and the scheduled workday after the holiday unless excused for a valid medical reason upon presentation to the Employer of a written excuse from the employee's physician. Employees on vacation when any of such holidays occur shall receive holiday pay in addition to their vacation pay.

(d)    All employees shall receive holiday pay whether said holiday falls on a working day or a non-working day.

(e)    Employees who are absent from work because of illness or injury shall be entitled to holiday pay for holidays falling during their absence in accordance with the following schedule:

| Length of Service | Maximum Period For Holiday Pay |
|---|---|
| 6 months to 2 years | 1 month |
| 2 years to 5 years | 2 months |
| 5 years to 8 years | 3 months |
| 8 years to 10 years | 4 months |
| 10 years and over | 6 months |

(f)    When two (2) holidays fall in one workweek, and the second holiday is Veteran's Day, Veteran's Day shall be a regular workday but the Friday of the succeeding week shall be considered as a legal holiday in its place within the meaning of all of the provisions of this Article.

(g)    Employees new to the industry shall not be entitled to holiday pay for scheduled holidays occurring during the first thirty (30) days of employment.

(h)    In addition to the holidays set forth above, each employee on the Employer's payroll for more than ninety (90) days shall be entitled to two (2) personal holidays. In lieu of one (1) of their personal holidays, employees may elect to celebrate Columbus Day. If elected by an employee, the Employer may not refuse to permit the employee to take such a day as a holiday unless the number of employees who elect to celebrate Columbus Day unduly interrupts production. For beginners new to the industry, see paragraph (j) below.

However, a personal holiday may not be celebrated in a week in which a scheduled holiday falls, nor on a Friday preceding a holiday which falls on a succeeding Monday, unless with the express consent of the Employer. No employee shall be required to work on his personal holiday once the date for its celebration has been agreed upon by the Employer and the employee.

Each employee shall give to his Employer not less than five (5) days notice of the dates on which he desires to celebrate his personal holidays. If the Employer rejects the first two (2) selections made by the employee, the employee shall have the absolute right to take the third of each selection upon request.

(i)    In the event there exists a conflict as to the celebration of any holiday as between the Federal Government and the State Government, the Labor Management Committee shall decide which day shall be the day on which it shall be celebrated. Such decision shall be reached thirty (30) days before the holiday or holidays occur.

(j)    Not withstanding the above, all new to the industry employees as defined in this Agreement, upon completion of thirty (30) days of employment shall be paid for the following holidays, for which they are not required to perform any work:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

In addition to the above these employees shall be entitled to one (1) personal holiday after twelve (12) months of employment and one (1) additional personal holiday after twenty-four (24) months of employment and shall receive the additional holidays below based upon their length of service in accordance with the following schedule:

Upon completion of 1 year ............ Martin Luther King Junior's Birthday
Upon completion of 2 years........... Good Friday

Upon completion of 3 years........... Presidents Day
Upon completion of 4 years........... Veterans Day and Presidential Election Day

## ARTICLE 10 - VACATIONS

(a)     All employees who have been in the employ of the Employer for periods of time specified below shall receive a vacation with pay in advance, at the regular rate paid at the time of such vacation in accordance with the following schedule:

6 months.........................18¾ hours regular pay
7 months to less than 1 year...1/12th of 37½ hours regular pay for each month worked
1 year.............................1 week
2 years and over................2 weeks
7 years and over................3 weeks
15 years and over..............4 weeks

(b)     After January 1, 1988, the maximum vacation entitlement per year shall be four (4) weeks. Employees hired on or after April 27, 1987 shall be entitled to a maximum of three (3) weeks vacation. Employees who have completed twenty (20) years of service with the Employer as of January 1, 1988 shall be eligible for five (5) days pay as deferred vacation pay upon termination of employment plus one (1) additional day's pay for each full year of service after January 1, 1988. The five (5) days of deferred vacation pay shall be prorated as for vacation pay if termination of employment occurs in 1988 for those who have already completed twenty (20) years of service and in the first year of entitlement for those who complete twenty (20) years thereafter. In the event of the death of an employee, the deferred vacation pay shall be paid to the employee's estate or other person lawfully entitled to receive it. Deferred vacation pay shall be calculated at the employee's rate of pay in effect at the time the employee terminates.

(c)     The first two (2) weeks of vacation to which an employee is entitled shall be given during the months of June, July, August and September. Any employee entitled to three (3) or more weeks of vacation may take up to three (3) weeks vacation in consecutive weeks only in the months other than June, July, August and September, at such times as may be mutually agreed upon between the Employer and the employee.

All employees shall be entitled to the set vacation, whether or not they shall have been employed by the Employer, continually or cumulatively for the period required. If the Employer is unable to obtain a replacement for a necessary employee, then the Union and such employee will cooperate in re-scheduling said employee's vacation.

(d)     An employee who has worked for said Employer continuously, or accumulated time required for any of the above vacation period, and who is laid off prior to the commencement of his vacation period, shall receive the vacation due him by reason of his length of service with full pay, irrespective of the fact that said employee has been laid off prior to the commencement of his vacation period.

(e)     In the event one (1) or more holidays occur during the time the employee receives his

vacation, he shall receive holiday pay in addition to his vacation pay.

(f)    Any employee quitting without at least five (5) business day's written notice to the Employer and the Union shall not be entitled to any vacation pay.

(g)    Vacation pay shall be at the employee's rate of pay at the time the employee takes his vacation and shall be paid to the employee with the last payroll check immediately prior to taking the vacation. Vacation pay shall be based upon the hours regularly worked by an employee during a week.

(h)    Not withstanding the above, all new to the industry employees as defined in this Agreement, who have been in the employ of the Employer for periods of time specified below shall receive a vacation with pay in advance, at the regular rate paid at the time of such vacation in accordance with the following schedule:

    1 year...........................1 week
    2 years and over...............2 weeks
    7 years and over...............3 weeks

## ARTICLE 11 - PRIOR BENEFITS

This Agreement shall not in any way or manner alter, change, or deprive any of the employees of conditions which they are presently enjoying or working under, which conditions may be better than those specified herein, and said employees shall continue to receive such better conditions for the duration of this Agreement.

## ARTICLE 12 - SICK LEAVE

(a)    Employees hired new to the industry on or after May 1, 1987 and whose employment commenced at any time before or on the first day of any contract year shall, during such contract year, be entitled to five (5) days' sick leave with pay at straight time, and employees whose employment commenced after the first work day of any contract year shall, during such contract year, be entitled to paid sick leave proportionate to the part of the contract year worked, provided that no employee shall be entitled to paid sick leave during the first six (6) months of his employment, and provided further that upon completion by a new employee of his first six (6) months of continuous employment, this right to paid sick leave shall be retroactive as follows:

    (1)    If hired within the six (6) months preceding the effective date of this Agreement, his right to paid sick leave shall be retroactive to said effective date, and
    (2)    If hired after said effective date, his right to paid sick leave shall be retroactive to the date of his hiring. Each employee employed in the industry as of May 1, 1987 shall receive five (5) days per year, except if an employee is hospitalized for two (2) consecutive nights or more for reasons other than cosmetic or other voluntary surgery and total period of disablement exceeds ten (10) working days, the employee shall be entitled to ten (10) sick days in that contract year. If this incident of disablement occurs over contract anniversary, employee shall be entitled to the ten (10) sick days in the new contract year. Employees hired new to the industry

on or after May 1, 1987 shall receive a maximum of five (5) sick days per year in all cases.

(b)    New employees are entitled to, but shall not receive, sick leave for any illness, which may occur during the first six (6) months of employment except as set forth in (e) herein. Payment for such illness shall be received upon completion of the six (6) months of employment.

(c)    If during the course of a contract year any employee has not used all of the sick leave to which he/she is entitled, he/she shall be entitled to a full day's pay at his regular rate for each day of unused sick leave.

(d)    Payments for unused sick leave shall be made within fifteen (15) days, by separate check, after the end of each contract year.

(e)    Employees not in the employ of the Employer throughout the entire contract year shall be entitled to pay for sick leave on a pro-rata basis. However, an employee who has not been in the employ of the Employer for six (6) months, who voluntarily quits or is discharged for cause, shall not be entitled to any sick leave.

(f)    An employee who terminates his employment or who is discharged for cause during any contract year, and who has used more than his pro-rata share, if any, of sick leave prior to such termination, shall reimburse such excess to the Employer, and the Employer shall have the right to deduct same from pay.

(g)    Not withstanding the above, all new to the industry employees as defined in this Agreement, upon completion of six (6) months of employment shall be entitled to two (2) days sick leave days in the first twelve (12) months of their employment and one (1) additional paid sick leave day for each twelve (12) months of employment thereafter up to a maximum of five (5) days.

## ARTICLE 13 - PROMOTIONS

(a)    In the case of promotion of an employee or employees covered by this Agreement, the principle of seniority shall be applied and the employee or employees with the longest tenure of employment shall be promoted whenever such employees are qualified to do the work.

(b)    Should the employee so promoted prove unsatisfactory during the first four (4) weeks, such employee must be transferred back to his previous job.

(c)    All employees transferred or promoted temporarily or permanently, to a job carrying a higher rate of pay, shall be paid the rate of the new classification.

## ARTICLE 14 - UNIFORMS AND TOOLS

(a)    The Employer will supply and cause to be laundered free of charge, to all inside employees, coats and aprons. The Employer will also supply whenever necessary rubber boots,

oil aprons and freezer coats. The Employer will furnish free of charge to all drivers, and driver helpers, coats, jackets or blouses, and overalls. The Employer will furnish the necessary tools, sharpening of tools and equipment, which may be required by employees in the performance of their duties.

(b)    The selection and maintenance of protective clothing and equipment as required by any City, State or Federal Agency shall be by the Employer. All protective clothing and equipment required by law must be used by the employees who shall be responsible for the proper use and safekeeping of such equipment, provided that the Employer provides each employee with a secure locker in which such clothing and equipment may be stored.

## ARTICLE 15 - SENIORITY

(a)    In the case of layoff of employees covered by this Agreement, such layoffs shall be on the basis of seniority wherever employees are qualified to do the work and the employee with the shortest tenure of employment shall be laid off first, except that the Shop Steward of Shop Delegate shall have top seniority.

(b)    No new employees are to be hired until all those laid off shall have been re-hired. On re-hiring employees previously laid off, employees shall be re-hired in the inverse order of layoff; that is to say, the employees last laid off shall be the first re-hired, whenever such employees are qualified to do the work then available.

(c)    Employees to be re-hired shall be given notice from the Employer by certified letter at their last known address, and a copy of same shall be sent to the Union, giving information as to time and date the employee should return to work.

(d)    Any employee who fails to report for work within a period of forty-eight (48) hours, excluding Saturdays or Sundays, loses his seniority rights unless such failure to report was caused by the employee's illness or other good reason and upon notification to the Employer within the forty-eight (48) hour period, will be given additional time to report.

(e)    The Employer shall be required to prepare and submit to the Union a seniority list based upon all employees' length of service, additions and deletions made on the seniority list as they occur, and the Union shall be furnished with a revised list every twelve (12) months.

(f)    The obligation to re-hire employees who have been laid off shall be according to the following schedule:

| Length of Employment | Period of Availability |
|---|---|
| 3 months to 5 years | 6 months |
| 5 years or more | 1 year |

(g)    Any employee who has been employed for three (3) months or more who becomes unable to perform his job due to sickness or injury shall be entitled to be re-employed upon

recovery in accordance with the following schedule:

| Length of Employment | Period of Availability |
|---|---|
| 3 months to 5 years | 6 months |
| 5 years or more | 1 year |

(h)     If an employee is absent for more than thirty (30) calendar days and the Employer has hired a replacement, the employee shall give to the Employer notice of his intention to return to work at least five (5) business days in advance of the start of the work week in which the employee intends to return, in order to enable the Employer to give proper layoff notice to the replacement employee.

(i)     Any employee eligible to return to work after sickness or injury shall, upon the request of the Employer, furnish the Employer with a physician's certificate that he is fit for employment.

(j)     There shall be no layoffs in the sixty (60) day period immediately prior to the termination of the contract except for economic hardship. If a question arises as to "economic hardship," the matter shall, within forty-eight (48) hours, be referred to one of the arbitrators named in Article 36(b) for binding arbitration.

## ARTICLE 16 - LEAVE OF ABSENCE

(a)     Any employee desiring a leave of absence from employment shall secure written permission from the Employer. A copy of such permission and schedule shall be sent to the Union. The Employer agrees that permission for a leave of absence will not be unreasonably withheld, taking into consideration the needs of the Employer and the employee and may be taken on the following basis:

| Service | Maximum Leave of Absence |
|---|---|
| 90 days to 1 year | 2 weeks |
| 1 year and over, but under 5 years | 1 month |
| 5 years and over, but under 10 years | 2 months |
| 10 years and over, but under 15 years | 3 months |
| Over 15 years | 4 months |

(b)     The employee shall lose his seniority rights and be automatically discharged if he has taken another position or tried out new work or ventured into business for himself during the said leave of absence, or if said employee should overstay his leave of absence, provided said overstay is not due to proven sickness or injury. Except for the foregoing, the seniority rights of an employee on an authorized leave of absence shall be preserved.

## ARTICLE 17 - LAY-OFF

(a)    Employees may be laid off as a result of lack of work and on condition that five (5) business days' written notice be sent by the Employer to the Union by certified mail, wherein the Employer sets forth the reason upon which he requests the layoff. The Shop Steward is to receive a copy of the notice sent to the Union.

(b)    In the event an employee is laid off, the employee shall receive any accrued wages, sick leave, vacation pay, or holiday pay to which employee is entitled within not more than fifteen (15) days following the layoff.

## ARTICLE 18 - DISCHARGE

(a)    No employee, except those on a trial period pursuant to this Agreement, shall be discharged except for just cause. In case of discharge, the Employer shall notify the Union and the Shop Steward and give reason for same in writing. If the Union disagrees with the discharge, then the grievance shall proceed to arbitration in accordance with the provisions of Article 36, and, if the arbitrator finds that the discharge was without just cause, then the employee must be reinstated with back pay and full benefits.

(b)    The Employer shall be required to discharge any employee upon notification by the Union to the effect said employee is not in good standing, within the meaning of the Labor Management Relations Act of 1947.

(c)    Employees who are discharged for stealing or theft shall not be entitled to any vacation, deferred vacation pay as set forth in Article 10(b), nor to accrued but unpaid sick leave. However, it is understood and agreed that in the event an arbitrator should conclude that the discharge of an employee was unjust, such employee shall be entitled (if the arbitrator so rules) to receive any unpaid vacation and sick leave.

## ARTICLE 19 - HEALTH CARE FUND

(a)    The Employer shall pay the following monthly contributions to the UFCW Local 174 Commercial Health Care Fund (the "Fund") within not more than ten (10) days after the end of each calendar month for each employee who has worked at any time during the month in order to provide Family Health Care Coverage for them under the 1st Level Plan of benefits:

| Effective Date | Contribution |
|---|---|
| June 1, 2003 | $448.00 |
| May 1, 2004 | $498.00 |
| May 1, 2005 | $548.00 |
| May 1, 2006 | $599.00 |

The Employer agrees to a twenty-five dollar ($25.00) call in the second, third and fourth years of the Agreement, calculated as a roll up. A drop in the three-month reserve triggers the twenty-five dollar ($25.00) call.

(b)     The Employer shall pay the following monthly contributions to the UFCW Local 174 Commercial Health Care Fund (the "Fund") within not more than ten (10) days after the end of each calendar month for each employee who has worked at any time during the month in order to provide Single Health Care Coverage for employees only with no legal dependents under the 1st Level Plan of benefits:

Effective June 1, 2003 and for the duration of this Agreement ............$250.00 per month

(c)     The rules of eligibility for coverage, waiting periods and the benefits to be provided to employees and their dependents shall be as provided in the summary plan description and/or other rules and regulations adopted by the Trustees of the Fund.

(d)     Said Fund shall be jointly administered by the Employer and the Union and the principal and income thereof shall be used for the sole and exclusive benefit of the employees of the Employers contributing thereto, and the families and dependents of said employees, and for the payment of all expenses including the administration and maintenance of said Welfare Fund. The Trustees are authorized to invade and expend the principal of said Fund, if necessary, to provide benefits to the employees, their families and their dependents.

(e)     The said Fund shall have its principal office in the City and State of New York, and shall be administered by a Board of Trustees consisting of an equal number of Union and Employer Representatives designated in accordance with the terms and provisions of the Agreement and Declaration of Trust of said Fund. In the event that said Employer and Employee Representatives deadlock in the administration of such Fund and there are no neutral persons empowered to break such deadlock, the said Employer and Employee Representatives shall agree upon an Impartial Umpire to decide such dispute and, in the event that said Employer and Employee Representatives fail to agree within a reasonable length of time on the Impartial Umpire to be selected, an Impartial Umpire to decide such dispute shall, on petition of either the Employer Representatives or the Employee Representatives, be appointed by the New York State Employment Relations Board.

(f)     Such Fund so administered shall be audited annually and the statement of the results of such audit shall be available for inspection by interested persons at the principal office of the Fund, at the office of the Union, at the offices of the various Employer Representatives, and at such other places as may be designated by the Board of Trustees.

(g)     Not more than once each contract year, the Employer agrees to continue to make contributions to the Fund for not less than four (4) months on behalf of any employee of the Employer who is disabled, injured in an accident, or suffering from an illness which prevents said employee from working for said Employer except that with respect to employees who are new to the industry such contribution shall not be required to be made until such new employee has completed six (6) months of employment in the industry .

(h)     The Employer hereby agrees to accept the Employer Trustees of the Fund, who have been selected as provided in the Agreement and Declaration of Trust of the Fund, as its Representatives in the joint administration of said Fund.

(i)     It is agreed between the Employer and the Union that should the Employer fail to comply with the terms of this Article, that the Union shall have a right, upon one (1) week's written notice to the Employer, to order a work stoppage of the employees of the Employer, and that such stoppage shall not be a breach of this Agreement.

(j)     The Employer agrees to direct the Employer Trustees to increase the life insurance benefit from fifteen thousand dollars ($15,000) to twenty-five thousand dollars ($25,000) provided, however, that this increase shall be subject to recommendation by the Fund's consultants' and the approval of the Fund's Trustees.

(k)     The Employer contribution rate for Health Insurance for employees who retire after May 9, 2003, between the ages of 62 and terminating at age 65 or death of the employee (retiree) whichever comes first, will be three hundred dollars ($300.00) per month to the UFCW Local 342 Health Care Fund as of June 1, 2003, and will remain at three hundred dollars ($300.00) per month for an eligible employee for the duration of the Agreement. Employees hired after May 9, 2003, are not eligible to receive Employer paid Health Insurance if retiring between the ages of 62 and 65.

## EMPLOYEES HIRED ON OR AFTER MAY 9, 2003

(l)     The Employer agrees to contribute to the Local 342 Health Care Fund for the purposes of providing a program of Health and Welfare benefits per month, per employee as established by the Trustees for each eligible full-time employee, hired on or after May 9, 2003, beginning with the first day of the month in accordance with the following schedule:

Full-Time Family Coverage

| | |
|---|---|
| Effective June 1, 2003 | $340.00 |
| Effective May 1, 2004 | $360.00 |
| Effective May 1, 2005 | $370.00 |
| Effective May 1, 2006 | $400.00 |

Single Coverage, One (1) Dependent

| | |
|---|---|
| Effective June 1, 2003 | $300.00 |
| Effective May 1, 2004 | $330.00 |
| Effective May 1, 2005 | $350.00 |
| Effective May 1, 2006 | $360.00 |

Single Coverage

| | |
|---|---|
| Effective June 1, 2003 | $160.00 |
| Effective May 1, 2004 | $180.00 |
| Effective May 1, 2005 | $200.00 |
| Effective May 1, 2006 | $240.00 |

The Employer agrees to a twenty dollars ($20.00) call in each year of the Agreement, if needed, with the exception of full time family coverage, which shall be a twenty-five dollar ($25.00) call in each year of the Agreement with roll-ups.

(m)    Contributions for all new employees shall commence with the first week following the completion of nine (9) months of employment.

(n)    The Employer shall provide, at no cost to its employees, such statutory disability and accident insurance coverage as may be required pursuant to the laws of the State of New York.

(o)    The Employer shall continue contributions to the Local 342 Health Care Fund for a period not to exceed six (6) months for an employee who is on authorized sick or injury leave.

(p)    The Employer agrees to be bound by the Agreement and Declaration of Trust as may be amended establishing the Local 342 Health Care Fund including the provisions for the collection of contributions.

## ARTICLE 20 - PENSION FUND

(a)    Effective May 9, 2003 and for the duration of this Agreement, the Employer shall pay monthly, within ten (10) days after the expiration of each calendar month, to the UFCW Local 174 Pension Fund, the sum of two hundred dollars ($200.00) per employee, per month for all employees who have worked at any time during the month.

The Employers agree that in the event the Board of Trustees of the Pension Fund notify the Union that an increase in contributions is necessary to maintain the current benefit level, the Employers will pay the increased amount as determined by the Trustees.

(b)    The Employer agrees to direct the Employer Trustees of the Fund to: (i) decrease the reduction in pension benefits from one-half percent (½%) per month to one quarter percent (¼%) per month for persons who elect early retirement; and (ii) increase the benefit level of participants for future credits by an additional five dollars ($5.00). It is understood that these changes shall be subject to the recommendation of the Fund's consultants and the approval of the Fund's Trustees.

(c)    The said Fund shall have its principal office in the City and State of New York, and shall be administered by a Board of Trustees consisting of an equal number of Union and Employer Representatives designated in accordance with the terms and provisions of the Agreement and

Declaration of Trust of said Fund. In the event that said Employer and employee Representatives deadlock in the administration of such Fund and there are no neutral persons empowered to break such deadlock, the said Employer and Employee Representatives shall agree upon an Impartial Umpire to decide such dispute, and in the event that said Employer and Employee Representatives fail to agree within a reasonable length of time on the Impartial Umpire to be selected, an Impartial Umpire to decide such dispute shall, on petition of either the Employer Representatives or the Employee Representatives be appointed by the New York State Employment Relations Board.

(d)    Such Fund as so administered shall be audited annually and the statement of the results of such audit shall be available for inspection by interested persons at the principal office of the Fund, at the office of the Union, at the offices of the various Employer Representatives, and at such other places as may be designated by the Board of Trustees.

(e)    The principal and income of said Fund shall be used for the sole purpose of providing for the employees of the Employers contributing thereto, retirement and other benefits based upon accepted actuarial standards and practices and in accordance with the provisions of the Agreement and Declaration of Trust which has heretofore been entered into between said Employer Representatives, the Union and the said Trustees, and the Pension Plan, By-laws, rules and regulations which have heretofore been or may hereafter be adopted by the said Board of Trustees and any and all amendments to the said Agreement and Declaration of Trust, Pension Plan, By-laws, rules and regulations.

(f)    The Employer hereby agrees to accept the Employer Trustees of the Fund who have been selected as provided in the Agreement and Declaration of Trust of the Fund as his Representatives in the joint administration of said Fund.

(g)    It is agreed between the Employer and the Union that should the Employer fail to comply with the terms of this Article, the Union shall have the right, upon one (1) week's written notice to the Employer, to order a work stoppage of the employees of the Employer, and that such a work stoppage shall not be a breach of this contract.

(h)    Not more than once each contract year, the Employer agrees to continue to make contributions to the Fund for not less than four (4) months on behalf of any employee of the Employer who is disabled, injured in an accident, or suffering from an illness which prevents said employee from working for said Employer, except that with respect to employees who are new to the industry such contributions shall not be required to be made until such new employee has completed six (6) months of employment in the industry, within the jurisdiction of the Union.

## ANNUITY BENEFIT FUND

(i)    Employees hired on or after May 9, 2003, the Employer agrees to contribute, following twelve (12) months of continuous service the following amounts to an Annuity Benefit Fund that has been established or will be established:

Effective June 1, 2003 and for the duration of this Agreement............$50.00 per month

(j)     Employees with less than five (5) years of service in the Industry as of May 9, 2003, the Employer will contribute the following amount to the Pension & Annuity Benefit Fund:

Effective June 1, 2003 and for the duration of this Agreement............$75.00 per month

This contribution of seventy-five dollars ($75.00) per month will be made in lieu of contributions to the UFCW Local 174 Pension Fund.

(k)     The Employer shall sign the appropriate Participation Agreements required to establish and maintain the Pension & Annuity Benefit Fund.

## ARTICLE 21 - SECURITY BENEFIT FUND

(a)     The Employer shall pay monthly, within not more than ten (10) days after the end of any calendar month, to the UFCW Local 174 Security Benefit Fund, the sum of ten dollars ($10.00) for each employee who has worked at any time during the month, and said contribution rate shall remain the same for the duration of the Agreement.

(b)     The said Fund shall have its principal office in the City and State of New York, and shall be administered by a Board of Trustees consisting of an equal number of Union and Employer Representatives designated in accordance with the terms and provisions of the Agreement and Declaration of Trust of said Fund. In the event that said Employer and Employee Representatives deadlock in the administration of such Fund and there are no neutral person empowered to break such deadlock, the said Employer and Employee Representatives shall agree upon an Impartial Umpire to decide such dispute, and in the event that said Employer and Employee Representatives fail to agree within a reasonable length of time on the Impartial Umpire to be selected, an Impartial Umpire to decide such dispute shall, on petition of Either the Employer Representatives or the Employee Representatives, be appointed by the New York State Employment Relations Board.

(c)     Such Fund so administered shall be audited annually and the statement of the results of such audit shall be available for inspection by interested persons at the principal office of the Fund, at the office of the Union, at the offices of the Employer Representatives, and at such other places as may be designated by the Board of Trustees.

(d)     Not more than once each contract year, the Employer agrees to continue to make contributions to the Fund for not less than four (4) months on behalf of any employee of the Employer who is disabled, injured in an accident, or suffering from an illness which prevents said employee from working for said Employer, except that with respect to employees who are new to the industry such contribution shall not be required to be made until such new employee has completed six (6) months of employment in the industry.

(e)     The Employer hereby agrees to accept the Employer Trustees of the Fund who have been selected as provided in the Agreement and Declaration of Trust, as his Representatives in the

joint administration of said Fund.

(f)    It is agreed between the Employer and the Union that should the Employer fail to comply with the terms of this Article, the Union shall have the right, upon one (1) week's written notice to the Employer, to order a work stoppage of the employees of the Employer, and that such work stoppage shall not be a breach of this Agreement.

(g)    The net principal and income, after defraying reasonable expenses, shall be allocated among individual accounts of employees who shall have the right to use their personal accounts to pay for such items as un-reimbursed medical expenses and to make such withdrawals for personal expenses as may be permitted by law in accordance with the trust Agreement and such plan, or rules and regulations as may be adopted by the Trustees.

## ARTICLE 22 - SAFETY-EDUCATION-CULTURAL FUND

The Employer agrees to contribute to the Amalgamated Meat Cutters & Retail Food Store Employees Union Safety Education and Cultural Fund Local 342, AFL-CIO, per month on behalf of each employee on the first day of the calendar month following completion of thirty (30) days of employment in accordance with the following schedule:

| Effective | Amount |
| --- | --- |
| June 1, 2003 | $4.00 |
| May 1, 2004 | $6.00 |
| May 1, 2005 | $8.00 |
| May 1, 2006 | $8.00 |

It is understood and agreed that the Safety-Education-Cultural Fund referred to herein shall be such as will continuously qualify for approval by the Internal Revenue Service.

The Employer agrees to be bound by the Agreement and Declaration of Trust as may be amended establishing the Safety-Education-Cultural Fund including the provisions for the collection of contributions.

## ARTICLE 23 - LEGAL FUND

The Employer agrees to contribute to the Amalgamated Meat Cutters & Retail Food Store Employees Union Legal Fund Local 342, AFL-CIO, per month on behalf of each employee on the first day of the calendar month following completion of thirty (30) days of employment in accordance with the following schedule:

| Effective | Amount |
| --- | --- |
| June 1, 2003 | $4.00 |
| May 1, 2004 | $6.00 |
| May 1, 2005 | $6.00 |
| May 1, 2006 | $6.00 |

It is understood that the Legal Fund referred to herein shall be such as will continuously qualify for approval by the Internal Revenue Service.

The Employer agrees to be bound by the Agreement and Declaration of Trust as may be amended establishing a closed panel, Representative Legal Fund, including the provisions for the collection of contributions.

## ARTICLE 24 - SEVERANCE

The Employer agrees to provide a severance payment equal to the amount of fifty dollars ($50.00) per month, for a period of forty-eight (48) months, equaling two thousand-four hundred dollars ($2,400.00). Such severance payment shall be paid to an employee who retires from the industry and was hired prior to May 9, 2003. Such severance payment shall be made within fourteen (14) days of the employees retirement date.

## ARTICLE 25 - UNION SIGN

The Employer shall display prominently in its place of business, the Union Shop Card for the purpose of informing the public that the Employer's establishment is fair to organized labor. However, such Union Shop Card shall remain the property of the Union and shall be surrendered upon failure of the Employer to comply with the provisions of this Agreement. The Union Shop Card shall be surrendered to the Union upon receipt of written notice sent to the Employer requesting the return of the Union Shop Card.

## ARTICLE 26 - TRAILERS

All trucks, railroad cars, and trailers, intrastate or interstate, shall only be unloaded by employees of the Employer.

## ARTICLE 27 - CHANGE IN DELIVERY OPERATION

Employers may not discontinue their present delivery practice which would result in the layoff of drivers who are covered under this Agreement, without prior written permission of the Union, which permission shall not unreasonably be withheld. Failure to make a delivery because of no parking facilities shall in no event be chargeable to the employee. The employee shall promptly notify the Employer of such condition as soon as practicable. The dispatcher must give approval before double-parking. The employee shall be responsible for all traffic tickets received except for double parking for delivery or non-operating violations of the truck. All tickets shall be delivered to the Employer promptly and a receipt given to the employee. Should the employee fail to report receipt of a ticket to the Employer, then the employee shall be responsible for all additional governmental penalties that may be assessed and will follow all DOT regulations.

## ARTICLE 28 - SHOP STEWARDS

The employees of the Employer shall elect an employee to serve in the capacity of Shop

Steward. All such elections shall be held under the supervision of a paid official of the Union. The Shop Steward shall, at all times, maintain preferred seniority over any and all other employees, irrespective of the term of his employment. The Shop Steward is hereby authorized to meet with the Employer for the purpose of aiding in the settlement of any disputes, which may arise by and between the Employer and the Employees.

The Employer will, with adequate notice, arrange for not more than one (1) Department Steward to have a Saturday off once each year with (8) hours straight-time pay for the purpose of attending the Local 342 Shop Steward's Conference, said conference to be scheduled in a week other than a holiday week.

## ARTICLE 29 - BEREAVEMENT LEAVE

(a)    In the event of a death in the immediate family of an employee, a regular employee shall be allowed up to three (3) days bereavement leave with pay at straight time for any time actually missed. "Immediate family" consists of spouse, parents, children, brothers and sisters.

(b)    In the event of the death of an employee's mother-in-law or father-in-law, a regular employee shall be allowed one (1) day of leave at straight time for any time actually missed.

(c)    Appropriate proof of death and relationship shall be submitted to the Employer, if so requested, in connection with any bereavement leave.

## ARTICLE 30 - JURY DUTY

(a)    Employees called for service on a jury shall be paid for each day of such service, the difference between the regular straight time earnings for their job classification, based upon a seven (7) hour day and thirty-five (35) hour week, and any jury fee or allowance received by them. An employee called for service on a jury shall immediately advise the Employer upon receipt of notice. No employee shall volunteer for jury duty. The employee so serving on jury duty shall present to the Employer a letter or memorandum from the Court or Jury Clerk showing the total number of days served and the total jury fee received. Members on jury duty shall be paid only for a maximum of two (2) weeks in any contract year.

(b)    In addition to the foregoing, the Employer shall pay up to a maximum of five (5) additional days of jury pay for employees who are required to serve on a Grand Jury.

## ARTICLE 31 - UNION VISITATION

The Business Agent or other Representative of the Union shall have the right to enter any of the work rooms of the Employer during the time the establishment is open for the purpose of investigation, or for the purpose of discussing with the Employer or his employees, any complaint or any other matter affecting the relations between the Employer's employees and the Union.

## ARTICLE 32 - INDIVIDUAL CONTRACTS

It is hereby understood and agreed by and between the respective parties hereto, that the Employer shall refrain from entering into any Agreements with any of its employees in order to modify any of the conditions contained herein.

## ARTICLE 33 - EMPLOYEES RIGHTS

An employee shall not be required to cross a picket line. The Union may participate in any or all-Union activities, strikes and boycotts, which may be permitted by existing legislation or court decisions. In the event of modification, amendment or repeal of existing legislation which affect the rights of the Union in participating in labor disputes or Union activities, the Employer hereby agrees that the Union shall be permitted to engage in such Union activity as herein before permitted and provided for in previous Collective Bargaining Agreements with the Union or as permitted by the modification, amendment or repeal of existing legislation.

## ARTICLE 34 - CORPORATION OR PARTNERSHIP

If the Employer is or becomes a corporation, this Agreement affects all the workers in the processing departments in the Employer's business whether such employees be stockholders or not, and all such workers are included in the term "Employees" as used in this Agreement. Whether the Employer be an individual, or partnership, or a corporation, no one, however connected with the Employer, shall be permitted to work more than the weekly number of hours provided for the members of the Union. Whether the Employer be a corporation or partnership, only one person having an ownership interest in the company, or who is classified as a salesman shall be permitted to work in the processing department of the Employer's business. Such person must be designated by the Employer at the signing of the contract. In no event shall such persons be permitted to do any manual work for longer hours of labor than those provided for employees working under their supervision. All such employees shall be Union members.

In the event a controversy arises with respect to the performance of production or manual work by salesmen, the matter shall, in the first instance, be referred to the Labor Management Committee, which shall meet promptly, consider the matter and make recommendations with respect thereto. In no way shall this be construed so as to deprive the Union of its right to proceed to arbitration concerning such controversy, if the Labor Management Committee has been unsuccessful in resolving such controversy or has failed to meet promptly to consider same.

## ARTICLE 35 - STRIKES OR LOCKOUTS

There shall be no strikes or lockouts for the duration of this Agreement. In the event that the Employer fails to comply with the terms, conditions and provisions herein and persists in its refusal to comply therewith, then and in such event, the Employer waives the provisions contained herein, and the Union shall have the privilege of declaring a stoppage upon one (1) week's prior written notice to the Employer. The Union, its officers, Representatives and/or

agents, shall not be held liable in the event that any of the Articles contained herein shall be found to be inconsistent with any existing Federal or State legislation, and as a result thereof, the Employer sustains loss or damage.

## ARTICLE 36 - GRIEVANCES AND ARBITRATION

(a)    All grievances arising out of or connection with this Agreement shall be reported to the Union. The Employer and the Shop Steward shall try to settle such grievance immediately in the plant. Should they not succeed in settling the dispute, the Employer and/or the Shop Steward shall notify the Business Agent(s) serving the employees of the Employer. If no Shop Steward has been designated, or if the Shop Steward is unavailable, the grievance shall be referred directly to the Business Agent servicing the establishment. The Union shall immediately try to reach an adjustment within two (2) working days. If no settlement of the grievance has been reached with ten (10) days thereafter, the matter shall be referred to arbitration as provided below. No claim shall be made with respect to any grievance unless such claim shall be presented to the Employer within ninety (90) days after the employee becomes aware of his right to make a claim. Illness of the employee will "toll" the ninety (90) day period.

(b)    Any claim or grievance involving the discharge of an employee shall be submitted to arbitration, before the impartial arbitrators under this Agreement within forty-five (45) days from the notice of discharge. The Employer agrees that all arbitrations will be heard by panel arbitrators only.  The panel shall consist of a total of six (6) arbitrators, three (3) by the Union and three (3) by the Employer. The parties have agreed that Michael Murray, John Sands, John Kennedy, Roger Maher, Chris Sabatella and Richard Adelman shall be designated as the impartial arbitrators to whom cases shall be referred to on a rotating basis, to the extent practicable, during the term of this Agreement, it being the intention of the parties hereto that all matters involving the discharge of an employee shall be heard by an Arbitrator, as rapidly as possible, following the conclusion of efforts to resolve the dispute. The designation of named Arbitrators shall not prohibit the parties from selecting any other arbitrator if it would serve to expedite the case. In addition, should the Employer/Company adjourn and/or withdraw the arbitration before the arbitrator; the Employer/Company will pay filing fees and all other arbitrator costs relating thereto.

(c)    Any grievances not involving the discharge of an employee shall be referred to a panel arbitrator for arbitration within thirty (30) days from the date on which the Union and the Employer agree that they are unable to reach an adjustment.

(d)    Any employee who shall be required to testify before hearings with regard to arbitration, mediation or the settlement of a dispute, and whose testimony is necessary and material, shall not suffer any loss in wages by reason thereof. Hearings, whenever possible, shall be held in the afternoon. Records of the Employer, kept in the normal course of business are to be made available to the Union, if necessary, for the settlement of a grievance.

(e)    There shall be no strike or lockout during the pendency of a dispute.

## ARTICLE 37 - LABOR-MANAGEMENT COMMITTEE

(a)    The Union agrees to appoint Representatives to the Labor-Management Committee, which shall consist of six (6) Union Representatives and six (6) Employer Representatives appointed by the Meat Trade Institute. The parties may agree to add or reduce the number of Representatives, provided at all times there shall be an equal number of Union and Employer Representatives. It shall be the function of said Committee to review any and all questions arising under this Agreement which may be referred to said Committee by the Union or the Employers, and to make such recommendations with respect thereto as will best serve to carry out the intent and purpose of this Agreement.

(b)    The said Labor-Management Committee is empowered to establish industry-wide apprentice training programs and adopt such rules and regulations as may be necessary to carry same into effect. The Labor-Management Committee may also establish such other and further rules and regulations as may serve to assure stability of employment and employment tenure, and to discourage unwarranted job shifting by employees, and it is hereby expressly agreed that any such rules and regulations as may hereafter be adopted by said Committee shall be considered part of this Agreement and shall have the same force and effect as if originally set forth in this Agreement.

(c)    The parties agree that the Labor-Management Committee shall make every effort to meet not less often than every two (2) months in order to review industry conditions and problems.

## ARTICLE 38 - REAL PARTY IN INTEREST

(a)    It is mutually agreed that the Union is the real party in interest under the terms of this Agreement with respect to the proper enforcement of any of its provisions, and no individual member of the Union may take any action with reference to any subject matter covered by this Agreement without the consent of the Union. No member of the Union shall have the right to institute any legal proceedings in any court or before any administrative tribunal against any Employer, on account of any matter directly or indirectly arising out of this Agreement or for the alleged breach thereof, without the written consent of the Union.

(b)    No Employer, who is a member of the Association signatory to this Agreement, shall have the right to institute any legal proceeding in any court, which might otherwise be maintained under the provisions of this Agreement against the Union, or any member thereof, on account of any matter directly or indirectly arising under this Agreement or for the alleged breach thereof, without the written consent of the Association. Anything to the contrary notwithstanding, nothing in this clause shall be construed as a modification of the provisions of this Agreement governing the submission of complaints, grievances and disputes to arbitration and the determination thereof.

## ARTICLE 39 - SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties herein, and their successors and assigns, and

no provision herein contained shall be nullified, or affected in any manner as a result of any consolidation, sale, transfer of assignment, of the parties herein, or by any change to any other form of business organization, or by any change, geographical or otherwise, in the location of the parties herein. The parties agree that they will not conclude any of the above transactions unless an Agreement has been entered into as a result of which this Agreement shall continue to be binding on the person or persons or any business organization continuing the business. It is the intent of the parties that this Agreement shall remain in effect for the full term hereof regardless of any change of any kind in the management location, form of business organization or ownership.

## ARTICLE 40 - SEPARABILITY

It is the express purpose and intent of the parties hereto that this Agreement shall conform in all respects to existing and future Federal and State legislation. Should any modification become necessary in order to effect such compliance, this Agreement shall be deemed to be automatically modified in that respect. However, all other provisions contained herein remain unaltered.

## ARTICLE 41 - CONTRIBUTIONS DEFAULT

(a)    In the event that the Employer should fail to pay when due the contributions payable to the UFCW Local 174 Commercial Health Care Fund, the UFCW Local 174 Pension Fund, and the UFCW Local 174 Security Benefit Fund, or to any of said Funds, the Union shall have the right, upon one (1) week's written notice to the Employer, to order a work stoppage of the employees of the Employer, and such work stoppage shall not be considered a breach of this Agreement.

(b)    In the event the Employer is delinquent or defaults in payment of any contribution to the UFCW Local 174 Commercial Health Care Fund, the UFCW Local 174 Pension Fund and the UFCW Local 174 Security Benefit Fund, or to any other Fund to which contributions are required by the Employer under this Agreement, any party to this Agreement and/or the Trustees of the Fund to which the contributions are due, may initiate action to collect the debt in which event the Employer shall pay, in addition to the amount of contributions due, all costs and expenses incurred by the initiating party in arbitration and/or court, or in other action and in the enforcement of any award or judgment including but not limited to, reasonable counsel fees, accountant's or auditor's fees, disbursements, and interest at the rate of eight percent (8%) per annum as to real persons and eighteen percent (18%), one-point-five percent (1.5%) per month per annum as to corporate entities. The Fund shall give the notice of default to the Employer, in writing, by certified mail, return receipt requested, giving the Employer the opportunity to cure the default within ten (10) days of the mailing of the notice of default.

(c)    Notwithstanding any provisions of this Agreement, the parties specifically agree that any claim for failure by an Employer to pay any contributions due under this Agreement to any Fund may be made and submitted for arbitration by any party hereto and/or by the Trustees of any Fund to which contributions are to be made pursuant to the provisions of the Agreement upon at least twenty (20) days written notice by certified mail to the last address of the Employer on record with the Office of the Fund to which contributions are due, and to John Kennedy, as

Arbitrator, or to such other arbitrator as the parties hereto may select, and the arbitrator's award shall be final and binding and enforceable in any court of competent jurisdiction.

(d)     Neither the right to initiate, nor the actual initiation of, the aforesaid arbitration procedure shall preclude any party hereto and/or the Trustees of any Fund to which contributions are due from pursuing any and all other remedies available to them against the Employer, and/or its shareholders, provided, however, that in any legal proceedings against the Employer, the Employer shall have the right to have the matter referred to arbitration provided for herein by appropriate legal proceeding within twenty (20) days of the institution of such legal proceeding, provided that the Employer agrees that any court order directing the submission of a matter of arbitration shall provide that the arbitrator shall have all powers of a court of record in hearing said matter to the extent permitted by Federal or New York State law.

(e)     The Trustees shall have the authority to audit the payroll books and records of the Employer, either directly or through a qualified public accountant, as they may deem necessary in the administration of the Trust Fund. Such audit may be undertaken pursuant to a routine audit program or on an individual basis. Whenever an audit is authorized, the Employer involved shall make available to the Trustees or the qualified public accountant designated by them, its payroll books and records. Such books and records shall include: (a) all records which the Employer may be required to maintain under Section 209(a)(1) of the Employee Retirement Income Security Act of 1974, and; (b) time cards, payroll journals, payroll check registers, canceled payroll checks, copies of the Employer's federal, state and local payroll reports and all other documents and reports that reflect the hours and wages or other compensation of the employees, or from which such can be verified. In the event the audit discloses that the Employer has not paid contributions as required by the collective bargaining Agreement, the Employer shall be liable for the cost of the audit. The Trustees shall have the authority, however, to waive all or part of such costs for good cause shown.

(f)     It is recognized and acknowledged by all parties, including the Employer, that the prompt and accurate payment of contributions is essential to the maintenance of an employee benefit Trust Fund and the benefit plans and that it would be extremely difficult, if not impossible, to fix the actual expenses and damage to the Trust Fund that would result from the failure of an Employer to pay the required contributions within the time provided. Therefore, if an Employer shall be delinquent in the payment of contributions, such Employer shall be liable, in addition, for liquidated damages of twenty percent (20%) of the amount of the contributions which are owed or twenty-five dollars ($25.00), whichever is greater. The Trustees shall have the authority, however, to waive all or part of the liquidated damages or interest for good cause shown. In any arbitration pursuant to this contribution default procedure, the arbitrator may also waive the liquidated damages, interest and attorneys fees for good cause shown, or if the Employer establishes that he had a bonafide dispute as to the amount due. Any court shall have the same power to waive the aforesaid items to the extent permitted by law.

(g)     Further, in the event the Trustees place the account in the hands of legal counsel for collection, the delinquent Employer shall be liable for reasonable attorney fees (with a minimum of twenty-five-dollars ($25.00) and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

(h)    The parties, with the concurrence of the Trustees of the Funds, reserve the right to allocate contributions as between the Funds so long as it is prudent to do so without affecting the actuarial soundness and solvency or any of the Funds.

## ARTICLE 42 - CREDIT UNION

Provided that it is given appropriate authorization to do so and upon such proof as may be required to proof that it is certified, the Employer agrees to deduct from an employee's wages such amount as designated by the employee and to remit such amount to the Union's Credit Union.

## ARTICLE 43 - DURATION OF AGREEMENT

This Agreement shall be in full force and affect from 12:00 a.m. on May 9, 2003 and shall expire at 11:59 p.m. on May 9, 2007. The Employer agrees there shall be no side letter Agreements from past negotiations that will supersede this Agreement once it has been integrated and signed by both parties.

**IN WITNESS WHEREOF,** this Agreement has been executed by the parties hereto as of the day and year first above written.

**WHOLESALE MEAT INDUSTRY
(MEAT TRADE INSTITUTE)**

_____
(Signature)

JOHN CALCAGNO
(Print Name)

PRESIDENT
(Title)

8/20/04
(Date)

**UNITED FOOD AND COMMERCIAL
WORKERS UNION LOCAL 342,
AFL-CIO, CLC**

_____
(Signature)

Donald Proniewych
(Print Name)

Contracts Director
(Title)

8/25/04
(Date)

## EMPLOYER

HaMS MEAT CORP
(Name of Company)

B-22 HPCM
(Address)

Bronx, N.Y. 10474
(City, State and Zip Code)

718-542-6900
(Phone Number)

_____
(Signature)

ALLAN LAZKY
(Print Name)

V.P.
(Title)

11/5/04
(Date)

# WAGE PROGRESSION SCHEDULES FOR BEGINNERS NEW TO THE INDUSTRY

The following classified beginners, who are new to the industry, shall be paid minimum hourly wages in accordance with the following schedules based upon their date of hiring by the Employer.

With respect to a beginning employee who is being paid pursuant to a progression schedule, such employee shall, at the next time he is to receive a progression increase, receive such increase (and all other progression increases thereafter) pursuant to the column of the schedule which is applicable for that time period.

Any beginner whose employment is terminated for any reason whatsoever before having completed his progression period shall, upon obtaining new employment, receive credit for the number of months previously worked in the industry in his classification in order to determine his or her applicable weekly starting wage rate as set forth.

However, with respect to Cutters, Boners, Veal Boner and Leg Openers who are beginners new to the industry, no rights of seniority shall exist among such employees for the first nine months of their employment. During such period the Employer shall have the right to layoff or discharge such beginner, at any time regardless of the order of hiring. After such period of employment and until such beginner shall have become a regular Cutter, Boner or Leg Opener, the Employer may layoff or discharge any such beginner regardless of seniority only after obtaining the approval of the Union after an examination of the capability of such beginner. The Employer shall have the right to layoff at all times, however, pursuant to Article 17 of this Agreement, any such beginner who is laid off before completing his apprenticeship and who is re-employed by another Employer shall commence his subsequent employment at the same wage plateau he had attained with his last Employer.

A "Lugger" shall be deemed to mean an individual whose principal duties are to load or unload trucks and who handles beef carcasses or boxes of beef with an average weight between sixty (60) and eighty (80) pounds.

A "Bench loader" shall be deemed to mean an individual whose principal job is to lift fresh meat and place it on a cutting bench.

The wages of beginners new to the industry hired as luggers on and after May 1, 1984 and before May 13, 1995 shall be as provided for in Schedule H.

The classification known as Packers, Porters, Wrappers and Tiers shall be combined in a new job classification known as "General Helpers" and the wages of persons hired in this classification on and after May 1, 1984 and before May 13, 1995 shall be as provided for in Schedule B.

Persons who operate forklifts or who are engaged in freight car unloading more than fifty percent (50%) of their time would otherwise be classified as luggers, shall receive the rate of pay for a Lugger in Schedule H and an additional five-dollars ($5.00) per week.

## SCHEDULE "A"

## THE MINIMUM HOURLY WAGES FOR EMPLOYEES OTHER THAN THOSE WHO ARE BEGINNERS NEW TO THE INDUSTRY SHALL BE AS FOLLOWS

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Sales Persons | $18.490 | $18.890 | $19.390 | $19.790 | $20.290 | $20.990 |
| Skinners (Vealers) | $18.470 | $18.870 | $19.370 | $19.770 | $20.270 | $20.970 |
| Skinners (Bob Calves) | $18.030 | $18.430 | $18.930 | $19.330 | $19.830 | $20.530 |
| Veal Boners/leg Openers | $17.410 | $17.810 | $18.310 | $18.710 | $19.210 | $19.910 |
| Drivers (3 or more axels) | $17.670 | $18.070 | $18.570 | $18.970 | $19.470 | $20.170 |
| Drivers (all other vehicles) | $17.590 | $17.990 | $18.490 | $18.890 | $19.390 | $20.090 |
| Cutters and Bonners | $17.390 | $17.790 | $18.290 | $18.690 | $19.190 | $19.890 |
| Freezer People | $17.150 | $17.550 | $18.050 | $18.450 | $18.950 | $19.650 |
| Scalers | $17.060 | $17.460 | $17.960 | $18.360 | $18.860 | $19.560 |
| Luggers | $16.930 | $17.330 | $17.830 | $18.230 | $18.730 | $19.430 |
| Veal Trimmers/Cutlet Makers | $16.620 | $17.020 | $17.520 | $17.920 | $18.420 | $19.120 |
| Packers | $15.730 | $16.130 | $16.630 | $17.030 | $17.530 | $18.230 |
| Porters | $15.730 | $16.130 | $16.630 | $17.030 | $17.530 | $18.230 |
| Wrappers and Tiers | $15.510 | $15.910 | $16.410 | $16.810 | $17.310 | $18.010 |
| Full Charge Bookkeeper | $15.470 | $15.870 | $16.370 | $16.770 | $17.270 | $17.970 |
| Billing, File Clerks and telephone Operators | $12.990 | $13.390 | $13.890 | $14.290 | $14.790 | $15.490 |
| Key Punch Operaters, Typists | $12.590 | $12.990 | $13.490 | $13.890 | $14.390 | $15.090 |

## SCHEDULE "B"

## GENERAL HELPERS WHO ARE NOT BEGINNERS NEW TO THE INDUSTRY

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.480 | $12.880 | $13.380 | $13.780 | $14.280 | $14.980 |
| After 3 months | $12.830 | $13.230 | $13.730 | $14.130 | $14.630 | $15.330 |
| After 6 months | $13.170 | $13.570 | $14.070 | $14.470 | $14.970 | $15.670 |
| After 9 months | $13.510 | $13.910 | $14.410 | $14.810 | $15.310 | $16.010 |
| After 12 months | $13.850 | $14.250 | $14.750 | $15.150 | $15.650 | $16.350 |
| After 15 months | $13.990 | $14.390 | $14.890 | $15.290 | $15.790 | $16.490 |
| After 18 months | $14.540 | $14.940 | $15.440 | $15.840 | $16.340 | $17.040 |

## SCHEDULE "C"

## VEAL TRIMMERS & CUTLET MAKERS

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.320 | $12.720 | $13.220 | $13.620 | $14.120 | $14.820 |
| After 3 months | $12.680 | $13.080 | $13.580 | $13.980 | $14.480 | $15.180 |
| After 6 months | $13.020 | $13.420 | $13.920 | $14.320 | $14.820 | $15.520 |
| After 9 months | $13.370 | $13.770 | $14.270 | $14.670 | $15.170 | $15.870 |
| After 12 months | $13.720 | $14.120 | $14.620 | $15.020 | $15.520 | $16.220 |
| After 15 months | $14.080 | $14.480 | $14.980 | $15.380 | $15.880 | $16.580 |
| After 18 months | $14.430 | $14.830 | $15.330 | $15.730 | $16.230 | $16.930 |
| After 21 months | $14.780 | $15.180 | $15.680 | $16.080 | $16.580 | $17.280 |
| After 24 months | $15.150 | $15.550 | $16.050 | $16.450 | $16.950 | $17.650 |

## SCHEDULE "D"

## CALF SKINNERS, BOB CALF SKINNERS AND VEALER

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.320 | $12.720 | $13.220 | $13.620 | $14.120 | $14.820 |
| After 3 months | $13.910 | $14.310 | $14.810 | $15.210 | $15.710 | $16.410 |
| After 6 months | $14.290 | $14.690 | $15.190 | $15.590 | $16.090 | $16.790 |
| After 9 months | $14.670 | $15.070 | $15.570 | $15.970 | $16.470 | $17.170 |
| After 12 months | $15.050 | $15.450 | $15.950 | $16.350 | $16.850 | $17.550 |
| After 15 months | $15.440 | $15.840 | $16.340 | $16.740 | $17.240 | $17.940 |
| After 18 months | $15.820 | $16.220 | $16.720 | $17.120 | $17.620 | $18.320 |
| After 21 months | $16.200 | $16.600 | $17.100 | $17.500 | $18.000 | $18.700 |
| After 24 months | $16.590 | $16.990 | $17.490 | $17.890 | $18.390 | $19.090 |
| Vealers after 24 months | $17.020 | $17.420 | $17.920 | $18.320 | $18.820 | $19.520 |

## SCHEDULE "E"

### VEAL BONERS AND LEG OPENERS

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.320 | $12.720 | $13.220 | $13.620 | $14.120 | $14.820 |
| After 3 months | $12.770 | $13.170 | $13.670 | $14.070 | $14.570 | $15.270 |
| After 6 months | $13.220 | $13.620 | $14.120 | $14.520 | $15.020 | $15.720 |
| After 9 months | $13.670 | $14.070 | $14.570 | $14.970 | $15.470 | $16.170 |
| After 12 months | $14.120 | $14.520 | $15.020 | $15.420 | $15.920 | $16.620 |
| After 15 months | $14.570 | $14.970 | $15.470 | $15.870 | $16.370 | $17.070 |
| After 18 months | $15.020 | $15.420 | $15.920 | $16.320 | $16.820 | $17.520 |
| After 21 months | $15.470 | $15.870 | $16.370 | $16.770 | $17.270 | $17.970 |
| After 24 months | $15.920 | $16.320 | $16.820 | $17.220 | $17.720 | $18.420 |

## SCHEDULE "F"

### GENERAL HELPERS AND AUTOMATIC MACHINE OPERATORS
### (VEAL ESTABLISHMENTS ONLY)

|  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $11.790 | $12.190 | $12.690 | $13.090 | $13.590 | $14.290 |
| After 3 months | $11.990 | $12.390 | $12.890 | $13.290 | $13.790 | $14.490 |
| After 6 months | $12.190 | $12.590 | $13.090 | $13.490 | $13.990 | $14.690 |
| After 9 months | $12.390 | $12.790 | $13.290 | $13.690 | $14.190 | $14.890 |
| After 12 months | $12.590 | $12.990 | $13.490 | $13.890 | $14.390 | $15.090 |
| After 15 months | $12.790 | $13.190 | $13.690 | $14.090 | $14.590 | $15.290 |
| After 18 months | $12.990 | $13.390 | $13.890 | $14.290 | $14.790 | $15.490 |
| After 21 months | $13.190 | $13.590 | $14.090 | $14.490 | $14.990 | $15.690 |
| After 24 months | $13.390 | $13.790 | $14.290 | $14.690 | $15.190 | $15.890 |

## SCHEDULE "G"

### CUTTERS AND BONERS

| | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.590 | $12.990 | $13.490 | $13.890 | $14.390 | $15.090 |
| After 3 months | $14.160 | $14.560 | $15.060 | $15.460 | $15.960 | $16.660 |
| After 6 months | $13.720 | $14.120 | $14.620 | $15.020 | $15.520 | $16.220 |
| After 9 months | $14.290 | $14.690 | $15.190 | $15.590 | $16.090 | $16.790 |
| After 12 months | $14.860 | $15.260 | $15.760 | $16.160 | $16.660 | $17.360 |
| After 15 months | $15.420 | $15.820 | $16.320 | $16.720 | $17.220 | $17.920 |
| After 18 months | $15.990 | $16.390 | $16.890 | $17.290 | $17.790 | $18.490 |
| After 21 months | $16.560 | $16.960 | $17.460 | $17.860 | $18.360 | $19.060 |
| After 24 months | $17.120 | $17.520 | $18.020 | $18.420 | $18.920 | $19.620 |

## SCHEDULE "H"

### LUGGERS

| | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|---|---|---|---|---|---|---|
| Starting rate | $12.860 | $13.260 | $13.760 | $14.160 | $14.660 | $15.360 |
| After 3 months | $13.380 | $13.780 | $14.280 | $14.680 | $15.180 | $15.880 |
| After 6 months | $13.900 | $14.300 | $14.800 | $15.200 | $15.700 | $16.400 |
| After 9 months | $14.420 | $14.820 | $15.320 | $15.720 | $16.220 | $16.920 |
| After 12 months | $14.940 | $15.340 | $15.840 | $16.240 | $16.740 | $17.440 |
| After 15 months | $15.460 | $15.860 | $16.360 | $16.760 | $17.260 | $17.960 |
| After 18 months | $15.980 | $16.380 | $16.880 | $17.280 | $17.780 | $18.480 |

## SCHEDULE "I"

### BENCH LOADERS

|                  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|------------------|---------|---------|---------|---------|---------|---------|
| Starting rate    | $12.270 | $12.670 | $13.170 | $13.570 | $14.070 | $14.770 |
| After 3 months   | $12.790 | $13.190 | $13.690 | $14.090 | $14.590 | $15.290 |
| After 6 months   | $13.310 | $13.710 | $14.210 | $14.610 | $15.110 | $15.810 |
| After 9 months   | $13.830 | $14.230 | $14.730 | $15.130 | $15.630 | $16.330 |
| After 12 months  | $14.350 | $14.750 | $15.250 | $15.650 | $16.150 | $16.850 |
| After 15 months  | $14.870 | $15.270 | $15.770 | $16.170 | $16.670 | $17.370 |
| After 18 months  | $15.390 | $15.790 | $16.290 | $16.690 | $17.190 | $17.890 |

## SCHEDULE "J"

### BILLING CLERKS, FILING CLERKS AND TELEPHONE OPERATORS

|                  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|------------------|---------|---------|---------|---------|---------|---------|
| Starting rate    | $12.190 | $12.590 | $13.090 | $13.490 | $13.990 | $14.690 |
| After 3 months   | $12.460 | $12.860 | $13.360 | $13.760 | $14.260 | $14.960 |
| After 6 months   | $12.720 | $13.120 | $13.620 | $14.020 | $14.520 | $15.220 |
| After 9 months   | $12.990 | $13.390 | $13.890 | $14.290 | $14.790 | $15.490 |

## SCHEDULE "K"

### KEY PUNCH OPERATORS AND TYPISTS

|                  | Effective 1/4/2004 | Effective 5/2/2004 | Effective 1/2/2005 | Effective 5/1/2005 | Effective 1/1/2006 | Effective 4/30/2006 |
|------------------|---------|---------|---------|---------|---------|---------|
| Starting rate    | $11.790 | $12.190 | $12.690 | $13.090 | $13.590 | $14.290 |
| After 3 months   | $12.060 | $12.460 | $12.960 | $13.360 | $13.860 | $14.560 |
| After 6 months   | $12.320 | $12.720 | $13.220 | $13.620 | $14.120 | $14.820 |
| After 9 months   | $12.590 | $12.990 | $13.490 | $13.890 | $14.390 | $15.090 |

## SCHEDULE "L"

## BEGINNING EMPLOYEES NEW TO THE INDUSTRY

The following classifications and progression rates shall be applicable to beginning employees who are new to the industry and who are hired after May 12, 1995:

|  | Helpers | Butchers | Drivers | Drivers with CDL |
|---|---|---|---|---|
| Starting rate | $7.40 | $9.00 | $10.00 | $10.00 |
| After 6 months | $7.60 | $9.40 | $10.25 | $10.75 |
| After 6 months | $7.80 | $9.80 | $10.50 | $11.50 |
| After 6 months | $8.20 | $10.20 | $10.75 | $12.25 |
| After 6 months | $8.60 | $10.60 | $11.00 | $13.00 |
| After 6 months | $9.00 | $11.00 | $11.25 | $13.75 |
| After 6 months | $9.40 | $11.40 | $11.50 | $14.50 |
| After 6 months | $9.80 | $11.80 | $11.75 | $15.25 |
| After 6 months | $10.29 | $12.20 | $12.00 | Scale |
| After 3 months | $10.49 | $12.60 |  |  |
| After 3 months | $10.69 | $13.00 |  |  |
| After 3 months | $10.89 | $13.40 |  |  |
| After 3 months | $11.09 | $13.80 |  |  |
| After 3 months | $11.29 | $14.20 |  |  |
| After 3 months | $11.49 | $14.60 |  |  |
| After 3 months | $11.69 | $15.00 |  |  |
| After 3 months | $11.89 | $15.62 |  |  |
| After 3 months | $12.18 |  |  |  |
| After 3 months | $12.47 |  |  |  |
| After 3 months | $12.76 |  |  |  |
| After 3 months | $13.05 |  |  |  |

Any employee whose wage rate is greater than that set forth on the above schedule will be slotted into the next highest rate of pay and thereafter will continue on the progression scale until completion.

May 7, 2003

Dear Employer

This letter confirms certain understandings reached during the negotiations resulting in the Agreement, effective May 7, 2003:

In the event that they add or change production so as to include prepackaged and/or case ready and/or facilities for centralized cutting, the Employers will hire UFCW Local 342 butchers from the retail supermarkets who have been displaced or laid off as a result, before the Employer hire from the open market. The Employer shall have the option to hire two (2) employees from the open market and one (1) from the Union.

Please countersign this letter to signify your acceptance and approval.

Very truly yours,

Richard Abondolo
President

ACCEPTED AND APPROVED:
May 7, 2003

EMPLOYER

BY: _John Calleya_
_Pres. MEAT TRADE_
_INSTITUTE_

May 7, 2003

Dear Employer

This letter confirms certain understandings reached during the negotiations resulting in the Agreement, effective May 7, 2003:

No Employer will be required to have direct deposit.  In addition, no employee can be required to accept direct deposit of his or her paycheck.

Please countersign this letter to signify your acceptance and approval.

Very truly yours,

Richard Abondolo
President

ACCEPTED AND APPROVED:
May 7, 2003

EMPLOYER

BY: _____

44

May 7, 2003

Dear Employer

This letter confirms certain understandings reached during the negotiations resulting in the Agreement, effective May 7, 2003:

In the event any Employer covered by this Agreement should relocate its present facility, the Employers understand that this Agreement will follow them to the new location.

Please countersign this letter to signify your acceptance and approval.

Very truly yours,

Richard Abondolo
President

ACCEPTED AND APPROVED:
May 7, 2003

EMPLOYER

BY: _[signature]_
Pres. Meat Grease
Institute